UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In the Matter of S.H., Parent of a student with a   :
disability, J.G.,   :
               Plaintiff,   :
  :     **MEMORANDUM**
      -against-   :   **OPINION & ORDER**
  :
THE NEW YORK CITY DEPARTMENT OF   :     09-cv-6072 (PGG)
EDUCATION [The Board of Education of the City  :
of New York] and THE CITY OF NEW YORK,   :
  :
           Defendants.   :
------------------------------------------------------------x

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff S.H., on behalf of her minor child, J.G., brings this action against the

New York City Department of Education and the City of New York ("DOE") under the

Individuals With Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400, et seq.  Plaintiff

appeals from a New York State Review Officer's decision denying tuition reimbursement for

Plaintiff's unilateral placement of J.G. in a private school for the 2008-09 school year.  Both

sides have moved for summary judgment.  For the reasons stated below, Defendants' motion will

be granted and Plaintiff's motion will be denied.

<u>**BACKGROUND**</u>

I.     <u>**STATUTORY FRAMEWORK**</u>

        "Congress enacted the IDEA to promote the education of children with

disabilities, 'to ensure that all children with disabilities have available to them a free appropriate

public education that emphasizes special education and related services designed to meet their

unique needs [and prepare them for further education, employment, and independent living, and]

. . . to ensure that the rights of children with disabilities and parents of such children are

protected.'" <u>Frank G. v. Bd. of Educ. of Hyde Park</u>, 459 F.3d 356, 363 (2d Cir. 2006) (quoting 20 U.S.C. § 1400(d)(1) and citing <u>Sch. Comm. of Burlington v. Dep't of Educ.</u>, 471 U.S. 359, 367 (1985)). "Under the IDEA, 'states receiving federal funds are required to provide 'all children with disabilities' a 'free appropriate public education.''" <u>R.R. ex rel. M.R. v. Scarsdale Union Free Sch. Dist.</u>, 615 F. Supp. 2d 283, 287 (S.D.N.Y. 2009) (quoting <u>Gagliardo v. Arlington Cent. Sch. Dist.</u>, 489 F.3d 105, 107 (2d Cir. 2007) (quoting 20 U.S.C. § 1400(d)(1)(A))).

A school district administers special education services through the development of an "individualized education program" ("IEP") for each child with disabilities. 20 U.S.C. § 1414(d). In New York, local committees on special education ("CSE") are responsible for determining whether a child should be classified as eligible for educational services under IDEA and, if so, for developing an appropriate IEP for that child. <u>Walczak v. Florida Union Free Sch. Dist.</u>, 142 F.3d 119, 123 (2d Cir. 1998) (citing <u>Heldman v. Sobol</u>, 962 F.2d 148, 152 (2d Cir. 1992)).

> An IEP must state (1) the child's present level of educational performance; (2) the annual goals for the child, including short-term instructional objectives; (3) the specific educational services to be provided to the child, and the extent to which the child will be able to participate in regular educational programs; (4) the transition services needed for a child as he or she begins to leave a school setting; (5) the projected initiation date and duration for proposed services; and (6) objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

<u>Id.</u> at 122 (citing 20 U.S.C. § 1401(a)(20)).

Parents who believe that their school district has failed to provide their child with a free appropriate public education ("FAPE") – due to an inadequate IEP or otherwise – may file a complaint with the state educational agency and request an impartial due process hearing before a hearing officer. <u>Id.</u> (citing 20 U.S.C. § 1415(b)(1)(E)); <u>see also</u> <u>N.C. ex rel. M.C. v.</u>

<u>Bedford Cent. Sch. Dist.</u>, 473 F. Supp. 2d 532, 535 (S.D.N.Y. 2007), <u>aff'd</u>, 300 F. App'x 11 (2d

Cir. 2008).  The decision of an impartial hearing officer ("IHO") may be appealed to a state

review officer ("SRO"), "after which any party still aggrieved may sue in either state or federal

court."  <u>Id.</u> (citing 20 U.S.C. § 1415(e)(2)).

It is well settled that parents pursuing an administrative challenge "may, at their

own financial risk, enroll the child in a private school and seek retroactive reimbursement for the

cost of the private school from the state."  <u>Gagliardo</u>, 489 F.3d at 111 (citing <u>Burlington</u>, 471

U.S. at 370).  Such reimbursement covers "'expenses that [the school district] should have paid

all along.'"  <u>T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.</u>, 554 F.3d 247, 252 (2d Cir.

2009) (<u>per curiam</u>) (quoting <u>Burlington</u>, 471 U.S. at 370-71).  Courts considering a

reimbursement request for the cost of private special education services must consider (1)

whether "the school district [has] fail[ed] to provide a FAPE"; (2) whether "the private school

placement is appropriate"; and (3) whether the "equities" warrant a reimbursement award in full

or in part.  <u>Forest Grove Sch. Dist. v. T.A.</u>, 129 S.Ct. 2484, 2496 (2009); <u>see also</u> <u>Frank G.</u>, 459

F.3d at 363-64.  "Parents seeking reimbursement for a private placement bear the burden of

demonstrating that the private placement is appropriate. . . ."  <u>Frank G.</u>, 459 F.3d at 364.

## II.    **ADMINISTRATIVE PROCEEDINGS**

In a letter to DOE dated September 8, 2008, Plaintiff requested an impartial

hearing concerning a CSE's determination that her child was non-handicapped.  (Pltf. R. 56.1

Stat. ¶ 36;[1] Parent Ex. A)  Plaintiff's letter contended that (1) the CSE's decision that general

---

[1]  Unless otherwise noted, citations to the parties' Rule 56.1 statements concern factual assertions that are admitted or are deemed admitted because they were not contradicted by citations to admissible evidence.  <u>See</u> <u>Giannullo v. City of New York</u>, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").

education was appropriate for J.G. was incorrect; (2) the school district had failed to offer J.G. a FAPE; (3) the Landmark School, the private school chosen by the parent, was appropriate for J.G.; and (4) the parent was entitled to tuition reimbursement for the cost of J.G.'s education at the Landmark School for the 2008-09 school year.  (Parent Ex. A)

The impartial hearing commenced on October 30, 2008, and concluded on December 10, 2008.  (Transcript of Proceedings before Impartial Hearing Officer ("Tr.") at 1, 324; IHO Findings of Fact and Decision ("Dec.") at 2)

**A.    The Evidence at the Impartial Hearing**

**1.    Development of J.G.'s IEP for 2008-09**

At the time of the hearing before the IHO in the fall of 2008, J.G. – who suffers from attention deficit hyperactivity disorder ("ADHD") – was 17 years old.  (Tr. 5, 33)  Plaintiff has placed J.G. in private school since 2003.  (Id. at 69)  For every school year between 2003 and 2006, a CSE issued an IEP classifying J.G. as "other health impaired," and the school district reimbursed the parent for private school tuition.  (Pltf. R. 56.1 Stat. ¶ 2; IHO Dec. 2; DOE Ex. 3 at 1, 4; Tr. 69)  Beginning with the 2006-07 school year – when J.G. entered tenth grade – Plaintiff placed him at the Landmark School, a private, residential facility in Massachusetts.  (Tr. 70-71; Parent Ex. W)  DOE provided partial reimbursement for J.G.'s tuition at Landmark for the 2006-07 school year.  (Tr. 71)

On June 30, 2007, a CSE issued an IEP classifying J.G. as "Other Health Impaired."  (Parent Ex. D at 1)  The CSE recommended a program of general education with special education support services and counseling twice a week.  (Id. at 1, 9-11)  Although the CSE considered placing J.G. in a special education class, it chose a general education setting because J.G. was "functioning at or close to grade level and [did] not require a fully modified

curriculum." (Id. at 10)  The CSE further found that J.G. could "be expected to derive benefit from instruction and interaction with non-disabled peers." (Id.)  Plaintiff opted to place J.G. at Landmark for the 2007-08 school year, and DOE subsequently entered into a stipulation with Plaintiff in which it agreed to pay a portion of J.G.'s tuition at the Landmark School.  (Pltf. R. 56.1 Stat. ¶ 3; Tr. 71)

On June 17, 2008, a CSE met to conduct its annual IEP review for J.G. in preparation for the 2008-09 school year.  (Pltf. R. 56.1. Stat. ¶ 4; Parent Ex. O)  Plaintiff did not appear at this meeting.  (Pltf. R. 56.1. Resp. ¶ 7)  A few minutes before the meeting began, a member of the CSE left a message on Plaintiff's cell phone stating that if the CSE did not hear from her in five minutes, the CSE meeting would proceed without her.  (Tr. 75-76)  Plaintiff did not receive the call, because she was inside a building where there was no cellular reception. (Id.)  She did not retrieve the message until that evening.  (Pltf. R. 56.1 ¶¶ 8, 9; Parent Ex. Q; Tr. 75-76)  Accordingly, the CSE's annual IEP review went forward without Plaintiff's attendance or participation.  (Pltf. R. 56.1 Stat. ¶ 10)  Plaintiff later sent a letter to the CSE stating that she had received notice of the meeting but believed that it concerned the 2007-08 school year – which had been the subject of a settlement – rather than development of an IEP for the 2008-09 school year.  (Parent Ex. Q)

At the June 17, 2008 meeting, the CSE issued a new IEP de-classifying J.G. for the 2008-09 school year; the CSE changed J.G.'s classification of "other health impaired" to "non-handicapped," and recommended a general education placement. (Pltf. R. 56.1. Stat. ¶¶ 12, 13; DOE Ex. 3 at 1; DOE Ex. 4 at 1)  In reaching this decision, the CSE cited J.G.'s 2006 test scores – the most recent data available – which indicated that J.G. was performing at or above grade level in both reading and math.  (DOE Ex. 3 at 3)  The IEP also stated that J.G.'s

"cognitive level is high average overall; verbal ability is high average; perceptual ability is superior; working memory is average and processing speed is low average." (Id.)

On July 23, 2008, Plaintiff received a copy of the new IEP.  (Pltf. R. 56.1. Stat. ¶ 14; Parent Ex. O)  On July 28, 2008, Plaintiff sent a letter to the CSE stating that she disagreed with the CSE's findings and requesting another meeting to craft a more appropriate IEP.  (Pltf. R. 56.1. Stat. ¶ 15; Parent Ex. O)  That same day, DOE sent Plaintiff a letter offering J.G. a general education placement at the High School for Law, Advocacy and Community Justice. (Pltf. R. 56.1. Stat. ¶ 16)

On August 11, 2008, DOE sent Plaintiff a letter granting her request for another CSE meeting to determine J.G.'s IEP for the 2008-09 school year.  (DOE Ex. 7)  DOE scheduled the meeting for August 20, 2008.  (Def. R. 56.1. Stat. ¶ 10; DOE Ex. 7)

On August 15, 2008, Plaintiff signed an enrollment contract with the Landmark School for the 2008-2009 school year.  (Def.'s R. 56.1 Stat. ¶ 13; Parent Ex. Z; Tr. 258)  Under the fee schedule attached to the contract, Plaintiff agreed to pay $56,650.00 for J.G.'s education at Landmark.  (Def. R. 56.1 Stat. ¶¶ 13-14; Parent Ex. Z, AA)

Plaintiff did not attend the August 20 CSE meeting, and asserts that she did not receive notice of that meeting.  (Def. R. 56.1 Stat. ¶ 11; Pltf. R. 56.1. Resp. ¶ 11)  The CSE issued a second IEP that once again concluded that J.G. was "non-handicapped," and recommended a general education placement.  (Def. R. 56.1. Stat. ¶ 12; DOE Ex. 9)

## 2.    J.G.'s Program at the Landmark School

J.G.'s attendance at the Landmark School began with the 2006-07 school year, when he entered tenth grade.  (Tr. 70-71; Parent Ex. W)  Landmark is "a co-educational day and boarding school for students who have a diagnosed language based learning disability, and also

average to above average cognitive function."  (Tr. 119; Pltf. R. 56.1 Stat. ¶ 49)  Enrollment at

Landmark provided J.G. with a "highly structured environment" which helped counter his "high

level of distractibility."  (Tr. 102-03; Def. R. 56.1. Stat. ¶ 16)  At Landmark, "every minute of

[the resident students'] day, from the minute they wake up, to the minute they go to sleep, is

structured and designed.  They do not have to make any decisions."  (Tr. 135)  Resident students

at Landmark are told when to wake, when to eat, when to do their homework, when to clean their

rooms, and when to play.  (Def. R. 56.1. Stat. ¶ 16)  At Landmark, J.G.'s classmates were

exclusively special education students, and his classes typically had a student-to-teacher ratio of

six-to-one.  (Def. R. 56.1 Stat. ¶ 16; Tr. 121)

        At the impartial hearing held between October 30 and December 10, 2008, two

Landmark employees testified concerning the benefits J.G. had received from his participation in

the residential program at Landmark.  Landmark school counselor Roberta De Cruz testified that

J.G. needed the residential component of Landmark's program because of the structure it

provided, the "quiet time" offered to do homework, and the opportunity to seek assistance from

teachers in the dormitory.  (Tr. 40)  John Adam Hickey, J.G.'s academic advisor and literature

teacher at Landmark, testified that J.G. was "highly distracted and . . . constantly needs

redirection, refocusing in order to remain on task."  (Tr. 126)  Hickey testified that the residential

program at Landmark was "advantageous" for J.G. because of its highly structured nature and

because J.G. "has a hard time self-regulating his attention and needs that constant one on one

attention with faculty to remain focused on task and [to] get his work done."  (Tr. 135, 138)

Hickey further testified that when Landmark faculty provided J.G. with a less highly structured

system, "he wasn't as successful."  (Tr. 146)

At the hearing, Plaintiff also offered a July 2006 report from Dr. Robin Forman,

J.G.'s psychologist.  Dr. Forman opined that J.G.'s

> impulsivity and distractibility make it unlikely that he would be able to learn in an
> average-size, busy classroom.  He needs a highly structured, individualized
> curriculum that can address his behavioral, cognitive, emotional, and academic
> needs.  [J.G.'s] distractibility, in combination with his impulsivity, makes it
> essential that the structured environment extends beyond the classroom; he
> requires a residential school, rather than a day school.  Placing [J.G.] in an
> environment where he feels overwhelmed could have severe, negative emotional
> consequences.

(Parent Ex. T at 8)  Dr. Forman went on to recommend that J.G. "be placed in a small,

specialized classroom (no more than 12 students) for students with learning and attention deficits

in the context of a residential school."  (Id.)

J.G. took the SAT Reasoning Test in March 2008, scoring in the 45th percentile

in critical reasoning, 20th percentile in math, and 38th percentile in writing.  (Parent Ex. V)  J.G.

took the Woodcock Reading Mastery Test in June 2008, scoring in the 45th percentile for word

identification and 53rd percentile for word attack.  (Parent Ex. X)  J.G. took the Gray Oral

Reading Test in June 2008, and scored in the 63rd percentile for rate, 50th percentile for

accuracy, and 63rd percentile for fluency.  (Id.)

### B.   Impartial Hearing Officer's Decision

At the hearing, DOE conceded that it had not provided J.G. with a FAPE for the

2008-09 school year.  (IHO Dec. 7; Def. R. 56.1. Stat. ¶ 20; Tr. 22)  DOE argued at the hearing,

however, that Plaintiff had not established that Landmark's residential program was appropriate

for J.G., and that the equities weighed against awarding Plaintiff tuition reimbursement. (Def. R.

56.1 Stat. ¶¶ 21, 24)

Noting that the parent bears the burden of proof as to the appropriateness of a unilateral placement, the IHO concluded that Plaintiff had not demonstrated that Landmark's highly structured environment was appropriate for J.G.:

> Based on the testimony of the student's teachers, the Petitioner's son requires supportive services, however there was no testimony that the student needed such a restrictive environment in class such as 6:1.  There is no evidence that the student would be unable to succeed in a less restrictive environment with support services.  Furthermore the student is academically capable of attending the most difficult math and science classes.  The Supreme Court has specifically rejected the contention that the "appropriate education" mandated by IDEA requires states to "maximize the potential of handicapped children."  Board of Educ. v. Rowley, 458 U.S. 176 (1982).

(IHO Dec. 7)

With respect to Plaintiff's decision to place J.G. in Landmark's residential program, the IHO noted that the "testimony regarding the necessity of [the] student's residential placement was vague."  (Id. at 7)  The IHO noted that while the record suggested that participation in the residential program was advantageous to J.G., both because the "Landmark School is designed for students to be residents" and because "[e]very minute of every day is structured and designed," the IHO determined that Plaintiff had not demonstrated that the residential program was necessary for J.G. to receive educational benefits, and thus Plaintiff had not established a right to reimbursement.  (Id. at 7-8)

With respect to equitable considerations, the IHO concluded that Plaintiff's explanations for missing the two CSE IEP meetings were not credible.  (IHO Dec. 8)  The IHO noted that Plaintiff "was fully familiar with the special education process and [was] aware that every year an IEP was created for her son."  (Id.)  The IHO went on to conclude that Plaintiff had provided "conflicting" explanations for not attending the first meeting, and found her explanation as to the second meeting "not credible in light of [her] sophistication with the

process and her contact with her attorney." (Id.)  Accordingly, the IHO held that Plaintiff had failed to satisfy either the second or third prong of the Burlington test.  (Id.)

> ### C.     State Review Officer's Determination

Plaintiff appealed the IHO's decision to the New York State Education Department's Office of State Review.  (Def. R. 56.1 Stat. ¶ 26)  The SRO carefully reviewed the evidence at the hearing – including J.G.'s entire educational history – and dismissed the appeal in a thorough, 14-page single-spaced decision on April 8, 2009.  (SRO Dec. 14)  The SRO determined that Plaintiff had not met "her burden to demonstrate that the unilateral placement [of J.G. at Landmark] was appropriate. . . ."  (SRO Dec. 14)  Having concluded that Plaintiff did not satisfy the second prong of the Burlington test, the SRO did not reach the issue of whether equitable considerations favored tuition reimbursement.  (Id.)

The SRO's reasoning concerning the second prong of the Burlington test – whether Plaintiff had demonstrated that the Landmark School was an appropriate placement – mirrored that of the IHO.  (Id. at 10-12)  The SRO reviewed J.G.'s performance in each of his classes during the 2008-09 school year and noted that several of his teachers – including his language arts, chemistry, and world history instructors – stated that he was able to apply many of his skills independently, without guidance from his teachers.  (Id. at 5-6)  The SRO further noted that J.G.'s performance on standardized tests, including the SAT, had led the CSE to conclude that he "was above average and 'non-handicapped.'"  (Id. at 6)

After conducting an extensive review of the applicable Supreme Court and Second Circuit cases concerning tuition reimbursement in the context of a unilateral placement (id. at 10-12), the SRO then turned to "the central issue in dispute":  "whether the student required a residential setting in order to receive educational benefits from his program and

whether the residential placement provided education instruction that was specifically designed to meet the student's unique special education needs."  (<u>Id.</u> at 12)

The SRO noted that "[a] residential placement is one of the most restrictive educational placements available for a student and it is well settled that a residential placement is not appropriate unless it is required for a student to benefit from his or her educational program." (<u>Id.</u>)  The SRO further noted that "the restrictiveness of the parental placement may be considered in determining whether the parents are entitled to an award of tuition reimbursement."  (<u>Id.</u>)  The SRO then turned to a review of the record to determine whether it demonstrated that J.G. required a residential setting in order to receive educational benefits.  (<u>Id.</u> at 13)

After discussing Landmark's highly structured environment, its academic program, and student-teacher ratios, the SRO considered the testimony from Landmark employees De Cruz and Hickey:

> The student's counselor . . . stated that she thought the student benefitted from the small classes, the availability of the adults around him, the opportunity to establish positive relationships with adults, as well as the individual help and mentoring; however, she did not comment on whether the student required the residential component in order to receive educational benefits.  When asked for his opinion regarding the student's need for the residential component of the program, the student's academic case manager responded as follows:
>
>> Landmark is designed for students to be residents.  Although some students are day students, the ones who are residents benefit the most. And the reason being is that every minute of their day, from the minute they wake up to the minute they go to sleep, is structured and designed. They do not have to make any decisions.

(<u>Id.</u> at 13 (quoting Tr. 135))

The SRO concluded that Plaintiff had not met her burden of demonstrating that Landmark's residential program was necessary for J.G. to receive educational benefits:

> I find that the hearing record is insufficient to show that this intense level of programming is required in order to meet the student's special education needs. Additionally, I note that there is no indication in the hearing record that students are mainstreamed at Landmark for either academic or nonacademic activities or have opportunities to interact with typically developing peers. The student's mother testified that the student had benefitted from the level program in the residential component and that the residential structure had been helpful for him; however, she did not indicate how or why the student required the residential program in order to receive educational benefits from his day program. Accordingly, I find the hearing record lacks sufficient evidence to support that the student required the residential program at Landmark in order to meet his special education needs.

(Id. at 13)

With respect to Dr. Forman's report – which recommended a residential program for J.G. – the SRO noted that it was stale, having been prepared in July 2006, nearly three years before the SRO's April 8, 2009 decision. (Id. at 14) The SRO further noted that the record indicated that J.G. had made progress in dealing with his learning challenges since the July 2006 report:

> Although [Dr. Forman's report] reflected that the student "could have severe, negative, emotional consequences" if he were placed in an environment where he felt overwhelmed, the hearing record does not support that this assertion was accurate at the time of the school year at issue. . . . The student's counselor testified that she believed the student still had a tendency to feel overwhelmed and frustrated, but that he was learning how to express that more appropriately and that he was learning to take responsibility for his behavior and develop a plan of action. As indicated above, the student's counselor reduced the frequency of her sessions with him to an "as needed basis" and had only seen him three times since the beginning of the school year. In light of the foregoing, given that the hearing record reflects that the student had made progress in his ability to handle being "overwhelmed," especially considering the reduction of counseling sessions, there is no basis in the hearing record to support the parent's claim that the student required a residential setting in order for his emotional, cognitive and behavioral needs to be met.

(Id. at 14)

Concurring with the IHO that "placement at Landmark was overly restrictive and that the parent ha[d] not met her burden to demonstrate that the unilateral placement was

appropriate," the SRO concluded that Plaintiff had failed to meet the second prong of the

Burlington test and was not entitled to tuition reimbursement.  (Id.)

On July 26, 2009, Plaintiff filed her action in this Court challenging the SRO's

determination.

## DISCUSSION

## I.     STANDARD OF REVIEW

"[T]he role of the federal courts in reviewing state educational decisions under the

IDEA is circumscribed."  Gagliardo, 489 F.3d at 112 (internal quotation marks omitted).  While

district courts must "engage in an independent review of the administrative record and make a

determination based on a 'preponderance of the evidence'" standard, id. (internal citations

omitted), "IDEA's statutory scheme requires substantial deference to state administrative bodies

on matters of educational policy," Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 191 (2d Cir.

2005), and courts "may not 'substitute their own notions of sound educational policy for those of

the school authorities which they review.'"  A.C. & M.C. ex rel. M.C. v. Bd. of Educ., 553 F.3d

165, 171 (2d Cir. 2009) (quoting Rowley, 458 U.S. at 206)).  Instead, reviewing courts "'must

give 'due weight' to [the administrative] proceedings, mindful that the judiciary generally

'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult

questions of educational policy.'"  T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist., 554

F.3d 247, 252 (2d Cir. 2009) (alterations in original) (quoting Gagliardo, 489 F.3d at 113

(quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 206 (1982))).

"Judicial deference is particularly appropriate when . . . the state hearing officers'

review has been thorough and careful," M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ., 226

F.3d 60, 66 (2d Cir. 2000) (alteration in original) (internal quotation marks omitted), and "when

the Court's decision is based solely on the administrative record." S.W. v. N.Y.C. Dep't of Educ., 646 F. Supp. 2d 346, 352 (S.D.N.Y. 2009) (citing Walczak, 142 F.3d at 129; Frank G., 459 F.3d at 367). The Second Circuit has also cautioned that "[a]n assessment of educational progress is a type of judgment for which the district court should defer to the SRO's educational experience." M.S. ex rel. S.S. v. Bd. of Educ., 231 F.3d 96, 105 (2d Cir. 2000).

As noted earlier, courts considering a tuition reimbursement request must consider (1) whether "the school district [has] fail[ed] to provide a FAPE"; (2) whether "the private school placement is appropriate"; and (3) whether the "equities" warrant a reimbursement award in full or in part. Forest Grove Sch. Dist., 129 S.Ct. at 2496; see also Frank G., 459 F.3d at 363-64. "Parents seeking reimbursement for a private placement bear the burden of demonstrating that the private placement is appropriate." Frank G., 459 F.3d at 364. Where the parent's unilateral placement is found to be inappropriate, the court need not address whether equitable considerations favor reimbursement. See Cerra, 427 F.3d at 192.

Here, the SRO's determination is entitled to deference. As noted above, the SRO's decision is extraordinarily thorough and careful. The decision likewise is well-reasoned, contains a detailed analysis of the hearing testimony and other evidence as well as the applicable law, and is fully supported by the evidence.[2] Finally, this Court's decision will be based solely on the same administrative record reviewed by the SRO.

---

[2] Plaintiff complains about two errors in the IHO decision. First – in what is clearly a typographical error – the IHO states that she is denying reimbursement for the "1999-2000 school year" (IHO Dec. 8), when the school year at issue is 2008-09. Second, the IHO erroneously refers to three IEP meetings in 2008, when only two meetings took place. These inaccuracies do not undermine the validity of the IHO's conclusions, much less the determination of the SRO.

## II.   PLAINTIFF HAS NOT DEMONSTRATED THAT THE LANDMARK SCHOOL WAS AN APPROPRIATE PLACEMENT

Because DOE concedes that it failed to provide a FAPE to J.G., this case turns on the second prong of the Burlington test:  whether the Landmark School was an appropriate placement for J.G.

> Subject to certain limited exceptions, "the same considerations and criteria that apply in determining whether the [s]chool [d]istrict's placement is appropriate should be considered in determining the appropriateness of the parents' placement. . . .  [T]he issue turns on whether a placement – public or private – is 'reasonably calculated to enable the child to receive educational benefits.'"

Gagliardo, 489 F.3d at 112 (alterations in original) (quoting Frank G., 459 F.3d at 364 (quoting Rowley, 458 U.S. at 207)).  No single factor is dispositive in determining whether the student's placement is appropriate.  Frank G., 459 F.3d at 364.  "Grades, test scores, and regular advancement . . . constitute evidence that a child is receiving educational benefit," but courts may also consider whether "the totality of the circumstances [demonstrates that the] . . . placement reasonably serves a child's individual needs."  Id.

A private placement is appropriate where parents "'demonstrate that the placement provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction.'"  Gagliardo, 489 F.3d at 112 (quoting Frank G., 459 F.3d at 365).  However, IDEA also requires that "special education and related services must be provided in the least restrictive setting consistent with a child's needs."  Walczak, 142 F.3d at 122.

IDEA's requirement that a child receive services "in the least restrictive setting consistent with a child's needs" reflects a policy determination – set forth in the Act – that "children with disabilities [should] be educated, 'to the maximum extent appropriate,' together with their non-disabled peers."  Id. (quoting 40 U.S.C. § 1412(5)).  While "parents seeking an

alternative placement may not be subject to the same mainstreaming requirements as a school board," M.S. ex rel. S.S., 231 F.3d at 105 (citing Warren G. v. Cumberland Cty. Sch. Dist., 190 F.3d 80, 84 (3d Cir. 1999) ("[T]he test for the parents' private placement is that it is appropriate, and not that it is perfect."); Cleveland Heights-Univ. Heights City Sch. Dist. v. Boss, 144 F.3d 391, 399-400 (6th Cir. 1998) (holding that private placement's failure to meet IDEA's mainstreaming requirement does not bar parental reimbursement)), "IDEA's requirement that an appropriate education be in the mainstream to the extent possible remains a consideration that bears upon a parent's choice of an alternative placement and may be considered by the hearing officer in determining whether the placement was appropriate. . . ." Id. (reversing district court's award of tuition reimbursement where SRO had determined that the private placement was too restrictive).  "Because [Plaintiff] chose a private school for [J.G.] that educated learning disabled students only, [Plaintiff] bears the burden of proving that such a restrictive non-mainstream environment was needed to provide [J.G.] with an appropriate education." Id. at 104 (emphasis in original).  Plaintiff has not met that burden here.

The administrative record does not demonstrate that J.G. required a residential program, a six-to-one teacher-student ratio, or a setting limited solely to learning disabled students in order to obtain educational benefits.  While Dr. Forman's report from July 2006 indicates that she believed J.G. required a residential program at that time, there is ample evidence that J.G. had progressed significantly between July 2006 and the 2008-09 school year. J.G. was performing at or above his grade level, was taking the most challenging math and science courses, was performing satisfactorily and in some cases exceptionally well in his classes, and indeed was functioning independently in a number of his classes.  J.G.'s scores on standardized tests also placed him in the average range or higher for his age group.

With respect to J.G.'s emotional and psychological development, the Landmark School counselor testified that J.G. had made significant strides in learning to control his feelings of frustration and of being overwhelmed, and that he was learning how to express himself more appropriately and learning to take responsibility for his actions.  J.G.'s progress in this area is also reflected in his decision to forego regular counseling sessions in favor of an "as needed" approach, in which he utilized counseling services only infrequently.  Given J.G.'s academic success, and the progress in his emotional and psychological development since 2006, Plaintiff has not demonstrated that it was necessary for J.G. to be placed in a residential program solely for learning disabled students in order to obtain educational benefits.

The testimony of the Landmark School counselor and teacher establish, at best, that the Landmark program was "advantageous" for J.G. and perhaps even necessary for J.G. to maximize his educational potential.  IDEA does not guarantee children with disabilities an education that maximizes their educational potential, however.  Instead, the Act requires states receiving federal funding to provide a FAPE that includes "'special education and related services' tailored to meet the unique needs of the particular child, 20 U.S.C. § 1401(8), and [that is] 'reasonably calculated to enable the child to receive educational benefits.'"  M.C. ex rel. Mrs. C., 226 F.3d at 62 (quoting Rowley, 458 U.S. at 207).  IDEA "does not require states to maximize the potential of handicapped children."  Id. (citing Rowley, 458 U.S. at 197 n.21).  "As the Supreme Court explained in Rowley, the purpose of the Act [is] "'more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside.'"  Id. (quoting Rowley, 458 U.S. at 192).  Accordingly, even accepting Plaintiff's evidence that J.G. benefitted from the Landmark program, she has not met

her burden to demonstrate that J.G. needed such a program in order to "receive educational benefits."[3]

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (Dkt. No. 10) is GRANTED and Plaintiff's motion for summary judgment (Dkt. No. 13) is DENIED. The Clerk of the Court is directed to terminate these motions and to close this case.

Dated:     New York, New York          SO ORDERED.
           February 18, 2011

_____
Paul G. Gardephe
United States District Judge

---

[3]  In the ad damnum clause of the Complaint, Plaintiff seeks a declaration that her "decision to place [J.G.] at the Landmark School, residential and/or day program was appropriate." (Cmplt. at 21 (emphasis added))  During the administrative proceedings, however, the case was tried on the issue of whether the residential placement was appropriate.  Plaintiff, for example, never offered evidence as to the cost of the day program alone.  Accordingly, while both the IHO and the SRO made findings indicating that Landmark was not an appropriate placement for any purpose (IHO Dec. 7-8; SRO Dec. 13-14), the IHO's decision is directed only to Plaintiff's "claim for reimbursement for the expense of her son's residential placement at Landmark." (IHO Dec. 7)  Similarly, in affirming the IHO's denial of reimbursement, the SRO did not separately address reimbursement for Landmark's day program.  Because the administrative determinations address only Plaintiff's right to tuition reimbursement for Landmark's residential program, this Court's opinion is limited to that issue.